UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH WEIDEMAN, | ) | CASE NO. 5:15CV1881 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| DAVE DOAK, et al., | ) | INTERIM REPORT AND |
| | ) | RECOMMENDATION OF |
| Defendants. | ) | MAGISTRATE JUDGE |
| | ) | |

This matter is before the undersigned on three motions to dismiss Plaintiff Joseph Weideman's ("Plaintiff") complaint pursuant to Fed. R. Civ. P. 12(b)(6).  ECF Dkt. #19, #30, #34. The first motion to dismiss was filed by Defendant Dave Doak on March 30, 2016.  ECF Dkt. #19. On April 25, 2016, the named defendants who were employees at the Allen-Oakwood Correctional Institution ("ACOI") at the time of the events described in Plaintiff's allegations, Mrs. K. Edwards, M. Shaw, M. Lynn, Mr. Couch, Amy Pederson, Kelly Haggard, Sheena Manley, Brooke Featheringham, and Carlos Perez (collectively, the "AOCI Defendants") filed a motion to dismiss.[1] ECF Dkt. #30.  On May 12, 2016, Defendant Dr. Vargo filed a motion to dismiss.[2]  ECF Dkt. #34. All pending motions to dismiss have been fully brief and will be discussed below in turn.

For the following reasons, the undersigned RECOMMENDS that the Court: GRANT Defendant Doak's motion to dismiss (ECF Dkt. #19); GRANT the AOCI Defendants' motion to dismiss (ECF Dkt. #30); GRANT Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests dismissal of all claims against Defendant Vargo, and DENY Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests that Plaintiff's second amended complaint be denied

---

[1] This combination of last names and first names, first initials, and otherwise abbreviated titles accurately reflects the docket.

[2] *See* n. 1, *supra.*

as futile; and dismiss Plaintiff's case with prejudice as to all defendants except Defendant Dr. Carol Miller.

## I.     FACTUAL HISTORY

For the purposes of the three outstanding motions to dismiss, the facts of the instant case are set forth in Plaintiff's second amended complaint.[3]  On July 8, 2013, Plaintiff was arrested and subsequently housed in the Portage County Justice Center (the "PCJC") as a pre-trial detainee.  ECF Dkt. #29-1 at 2.  Approximately ten days later, Plaintiff was "placed" in an anti-suicide smock and put in a holding cell on suicide watch.  *Id.*  Plaintiff asked why he was on suicide watch, and was told it was because of a letter that he had tried to mail that morning and that he had to be placed on suicide watch for twenty-four hours and be evaluated by a doctor.  *Id.*  The following day, Plaintiff was seen by a doctor, removed from suicide watch, moved to the segregation unit, and later transferred to the general population.  *Id.* at 2-3.

A couple of days after returning to the general population, Plaintiff experienced increased pain in his neck, where Plaintiff had underwent a prior fusion procedure, and reported the pain to Defendant Vargo, chief medical officer at the PCJC.  ECF Dkt. #29-1 at 3.  The following day, Plaintiff was examined by Defendant Vargo, and a x-ray of Plaintiff's neck was taken the next day. *Id.*  The day after the x-ray, Plaintiff was at a table in the day-room when he heard a loud "pop" and subsequently experienced extreme pain.  *Id.*  Plaintiff then told a nurse that he believed the second fusion rod in his neck had broken.  *Id.*  The nurse told Plaintiff that she would tell a doctor, and returned approximately thirty minutes later to inform Plaintiff that Defendant Vargo said to put Plaintiff on bed rest until he could be seen the coming Tuesday.  *Id.*  Plaintiff expressed concern that it was a Thursday and that he would now have to wait until the coming Tuesday to be seen by a physician.  *Id.*

Approximately thirty minutes after the nurse left, Plaintiff was transferred to the segregation unit.  ECF Dkt. #29-1 at 3.  Later that night, Plaintiff reported that he was in severe pain, and told

---

[3]The Order filed contemporaneously with this Report & Recommendation granted Plaintiff's Motion Pursuant to Federal Rule 15(A) to Amend Complaint Via Clarity of Torts (Leave Request) (ECF Dkt. #29), thereby allowing Plaintiff to file a second amended complaint (ECF Dkt. #29-1).

a nurse that he was unable to use the toilet because he could not stand and walk. *Id.* The nurse told Plaintiff that he would have to figure out how to use the toilet or go in his pants because she would not help him use the toilet. *Id.* After crawling to the toilet, Plaintiff was able to stand on his knees to urinate, and then pulled his mattress from his bunk and positioned it on the floor between the bunk, toilet, and door slot through which he received meals. *Id.* Plaintiff remained in the segregation unit for approximately four days. *Id.*

The following Tuesday, Plaintiff met with Defendant Vargo, who informed him that nothing in his neck was broken. ECF Dkt. #29-1 at 4. Defendant Vargo then left the examination room, and made comments to fellow employees, indicating that "if rods really were broken in Plaintiff's neck [Defendant Vargo] would strap him down with sandbags beside [his] head to keep him alive." *Id.* Plaintiff claimed that the x-rays read by Defendant Vargo were not images of his neck, and asked that Defendant Vargo call a surgeon at the Cleveland Clinic who had previously x-rayed Plaintiff's neck and confirmed that the fusion rod on the right side of Plaintiff's neck was broken. *Id.* Following this exchange, Plaintiff was returned to his cell in the segregation unit. *Id.* Approximately one hour later, a nurse arrived in the segregation unit and Plaintiff was called from his cell to speak with the nurse. *Id.* The nurse provided four Motrin to Plaintiff for his discomfort.[4] *Id.* Plaintiff asked the nurse whether Defendant Vargo had spoken with the surgeon at the Cleveland Clinic, and the nurse indicated that Defendant Vargo had spoken with the surgeon, and was prescribing the Motrin accordingly. *Id.*

Approximately two weeks later, on August 15, 2013, Plaintiff appeared for an initial appearance, during which he told the judge that he was not receiving medical treatment and requested to have his own doctor take x-rays. ECF Dkt. #29-1 at 4. The judge indicated that if Plaintiff could find a doctor that would order x-rays, she would order that Plaintiff be transported to the doctor so that the x-rays could be taken. *Id.* After apparent difficulty in contacting his attorney, Plaintiff was able to contact his family doctor on September 25, 2013. *Id.* at 5. On

---

[4]Motrin (ibuprofen) is a nonsteroidal anti-inflammatory drug used to reduce fever and treat pain or inflammation caused by many conditions, such as headache, toothache, back pain, arthritis, menstrual cramps, or minor injury. Motrin, https://www.drugs.com/motrin.html (last visited January 4, 2017).

September 27, 2013, Plaintiff's attorney took an order for x-rays issued by Plaintiff's family doctor to the judge. *Id.* Plaintiff again appeared in court on September 30, 2013, for sentencing, and the judge indicated that he would receive medical treatment in hospital facilities at Ohio State University ("OSU"). *Id.*

On October 3, 2013, Plaintiff was transferred from AOCI to Lorain Correctional Institution ("LCI"). ECF Dkt. #29-1 at 5. Plaintiff saw a podiatrist on October 9, 2013, and the podiatrist ordered a foot brace and a cane because of the foot drop in Plaintiff's left foot. *Id.* X-rays were taken on two occasions over the following two to three weeks. *Id.* On October 29, 2013, Plaintiff spoke with Defendant Carol Miller, a doctor at OSU, via video conference.[5] *Id.* at 6. Defendant Miller informed Plaintiff that she was having him brought to OSU for a CT scan because the x-rays did not reveal the problem and Plaintiff was not a candidate for a MRI. *Id.* Plaintiff was transferred to Richland Correctional Institution on November 25, 2013. *Id.* at 6.

On December 12, 2013, Plaintiff was transported to OSU for "what he assumed was the [CT] scan." ECF Dkt. #29-1 at 6. Plaintiff met with Defendant Miller, and stated that two rods in his neck were "screeching and banging" when rubbed together. *Id.* Defendant Miller told Plaintiff that it was normal for rods to break for up to five years after installation, and then left the examination room. *Id.* On December 13, 2013, Plaintiff visited Dr. Granson, who stated that Defendant Miller recommended pain management and prescribed Tegretol.[6] *Id.* Plaintiff stated that Tegretol was for epilepsy, not pain management, and Dr. Granson indicated that there was nothing else he could do about the medication. *Id.* Plaintiff filed an informal complaint in March 2014, presumably regarding his pain. *Id.* On March 23, 2014, Plaintiff received a response to his informal complaint, indicating that he had been seen by Defendant Miller and that she had determined that the fusion

---

[5]Defendant Miller has filed an answer in this case, but has not yet filed a dispositive motion. *See* ECF Dkt. #52.

[6]Plaintiff does not provide any additional information on Dr. Granson or his affiliation to any institution; Tegretol is an anticonvulsant used to treat certain types of seizures. Tegretol, https://www.drugs.com/tegretol.html (last visited January 4, 2017).

rods in Plaintiff's neck were not broken, and then ordered that Plaintiff follow up with Dr. Granson. *Id.*

On May 25, 2014, Plaintiff was again transferred to AOCI, where he was seen by Defendant Perez, chief medical officer at AOCI, on June 6, 2014.  ECF Dkt. #29-1 at 7.  Defendant Perez renewed all of Plaintiff's orders and restrictions, and a nurse wrote out a new cane order.  *Id.*  When the nurse tried to hand Plaintiff a copy of the cane order, Defendant Perez stated that a copy was no longer given to the inmate, and was instead kept in the medical file.  *Id.*  In July 2014, Plaintiff fell when his right knee "went out."  *Id.*  Plaintiff saw Dr. Lin after the fall, and x-rays of his right knee were ordered.[7]  *Id.*  Following the x-rays, Plaintiff received notice that the images revealed abnormalities in his right knee.  *Id.*  A follow up with Dr. Lin the following week resulted in diagnoses of arthritis and bone spurs in the right knee, and Dr. Lin gave Plaintiff a knee brace, issued a no standing order, and advised that Plaintiff walk as little as possible.  *Id.*  On August 27, 2014, Plaintiff attempted to explain Dr. Lin's diagnosis to Defendant Edwards, a health care administrator at AOCI, in an effort to again see Dr. Lin.  ECF Dkt. #29-1 at 7.  After Plaintiff explained the diagnosis, a disagreement related to Plaintiff's condition arose and Defendant Edwards allegedly threatened to move Plaintiff to a different facility.  *Id.*

On August 28, 2014, Defendant Shaw, a corrections officer at AOCI, approached Plaintiff while he was in line to receive his pills and stated that Plaintiff's cane was going to be taken away since he did not have a cane order.  ECF Dkt. #29-1 at 7.  Plaintiff contended that he did have a cane order, to which Defendant Shaw allegedly responded by listing the information that was in Plaintiff's medical file.  *Id.*  In response to Defendant Shaw's statement, Plaintiff asked why she had been in his medical file, and Defendant Shaw indicated that a nurse had told her the information contained therein.  *Id.*  On August 29, 2014, Plaintiff informed Defendant Perez of the encounter with Defendant Shaw, and Defendant Perez reviewed Plaintiff's file before affirming that his cane could not be taken away.  *Id.*  The following day, Plaintiff was stopped by Defendant Lynn and Defendant Couch, who stated they were there to take away his cane after being informed by a nurse

---

[7]No additional information is provided regarding Dr. Lin's full name, specialty, title, etc.

that Plaintiff did not have a cane order.  *Id.* at 7-8.  Plaintiff determined that the nurse who told Defendant Lynn and Defendant Couch that he did not have a cane order had to have been Defendant Pederson, a nurse at AOCI, because "[Plaintiff] had spoken to her and she told him he had none that day."  *Id.* at 8.  Plaintiff was then told that he "should watch who and what [he] wrote up" by Defendant Lynn, who also told Plaintiff that he had himself to thank, presumably for removal of the cane, since Plaintiff had told Defendant Edwards that he was writing her up for threatening to move him to a different facility.  *Id.*  Defendant Lynn then took Plaintiff's cane.  *Id.*  Plaintiff told Defendant Couch that he was a witness that Plaintiff "had requested to speak with a white shirt four times," to which Defendant Couch responded that he had not witnessed anything.  *Id.*

On September 4, 2014, Plaintiff spoke with his case manager and was told to file an informal complaint.  ECF Dkt. #29-1 at 8.  Plaintiff filed the informal complaint that day, and returned the following day to follow up on the complaint.  *Id.*  The case manager then called a member of the medical staff to determine whether there was a cane order in Plaintiff's medical file.  *Id.*  About forty minutes later, Plaintiff's case manager informed him that an email had been received confirming the existence of a cane order in Plaintiff's medical file, and that the cane would be returned that day. *Id.*  The following day, Plaintiff's case manager informed him that Defendant Lynn had stated in a meeting that Defendant Edwards had instructed him to take Plaintiff's cane, and that Defendant Edwards had claimed that this was a lie.  *Id.*

On September 16, 2014, Plaintiff visited Defendant Perez and told him about events surrounding the cane order after waiting in the medical wing for several hours beyond the time his appointment was originally scheduled to start.  ECF Dkt. #29-1 at 8.  Plaintiff was then instructed to return to his housing unit.  *Id.*  Following this visit, Plaintiff went to Sgt. Olds' office and told her what was happening.[8]  *Id.*  During his visit with Sgt. Olds, Plaintiff overheard a phone call indicating that "[they were] trying to take his cane again."  *Id.* at 8-9. Plaintiff stated that "they were going to take his cane again," and Sgt. Olds told him not to cause trouble and that the matter would be handled the proper way through paperwork.  *Id.* at 9.  Sgt. Olds also informed Plaintiff that "the

---

[8]Plaintiff did not provide additional information regarding Sergeant Olds' name or role at AOCI.

people you need to talk to [from the inspector's office in Columbus] just left at [2:00 P.M.]." *Id.*
Plaintiff then stated that it was for this reason that he was kept waiting when he went to see
Defendant Perez.[9] *Id.*

Plaintiff was then called back to the medical wing. ECF Dkt. #29-1 at 9. When Plaintiff
arrived, Defendant Haggard, a nurse at AOCI, walked out of Dr. Perez's office and told Plaintiff that
he was required to leave his cane. *Id.* Plaintiff left the cane and returned to Sgt. Olds' office, where
she told Plaintiff she had already sent an email about Plaintiff's cane and that they should know
more the following day. *Id.* The next day, September 17, 2014, Plaintiff again went to Sgt. Olds'
office. *Id.* Sgt. Olds informed Plaintiff that she had received an email in response to the email sent
the previous day, indicating that Defendant Perez had seen Plaintiff in the yard "walking fine" and
"twirling his cane," resulting in a reevaluation and determination that Plaintiff no longer needed a
cane. *Id.* Plaintiff told Sgt. Olds that he would never engage in the type of behavior alleged in the
email, and indicated that he needed his cane. *Id.* Sgt. Olds advised Plaintiff that he should seek
resolution of these issue through the proper channels. *Id.*

On September 18, 2014, Plaintiff filed an informal complaint against Defendant Edwards.
ECF Dkt. #29-1 at 9. Plaintiff sent an "inmate accommodation request form" to Defendant
Featheringham, the Americans with Disabilities Act ("ADA") representative at AOCI, on September
26, 2014. *Id.* Plaintiff made two further inquiries to Defendant Featheringham in November 2014
regarding his inmate accommodation request form. *Id.* at 11-12. On October 2, 2014, Plaintiff
received a response to his informal complaint against Defendant Edwards, in which it was stated that
the treating physician determined whether a cane order was issued, and, at this time, the cane order
was not valid. *Id.* at 9. In response, Plaintiff filed a grievance on October 5, 2014. *Id.* On October
8, 2014, Warden Kevin Jones visited Plaintiff's cell block, and Plaintiff talked to him about

---

[9]Plaintiff does not provide further elaboration as to who was at AOCI from the "inspector's office
in Columbus," or explain why he was kept waiting to see Defendant Perez until these individuals had left
AOCI.

Defendant Haggard and Defendant Perez.[10]  *Id.*  Warden Jones stated that he could not override a medical decision and that Plaintiff should handle his problems via the grievance process.  *Id.*  Plaintiff was informed on October 9, 2016, that his Ultram prescription would expire on October 25, 2014, and that he was required to complete a healthcare request if he wished to continue the medication.[11]  *Id.*  Plaintiff submitted the healthcare request on October 13, 2014.  *Id.*

On October 14, 2014, Plaintiff was asked by a nurse why he did not appear for his doctor's appointment that day, and he stated that he did not receive a pass.  ECF Dkt. #29-1 at 9.  Plaintiff then spoke to several corrections officers, who indicated that Plaintiff was not on the doctor's list and that no one had called for him to be brought in for an appointment.  *Id.* at 10.  Next, Plaintiff spoke with his case manager, who checked the electronic pass lists and stated that Plaintiff was not on any pass list from October 14, 2014, to October 16, 2014.  *Id.*  On October 15, 2014, Plaintiff spoke with the nurse who had initially asked him why he did not appear for the October 14, 2014, doctor's appointment, and Plaintiff asked who had marked him as a "no show."  *Id.*  The nurse stated that it was Defendant Pederson who marked that Plaintiff did not appear for the appointment.  *Id.*  Plaintiff then asked Defendant Pederson why she had marked that he did not appear for the October 14, 2016, appointment, and Defendant Pederson stated it was because Plaintiff missed the appointment.  *Id.*  Continuing, Plaintiff stated that he never received a pass, and Defendant Pederson indicated that she did not control the passes.  *Id.*  Plaintiff then stated that Defendant Pederson did not request a pass through the pass system.  *Id.*

On October 17, 2014, Plaintiff received a pass to see Dr. Lin, rather than Dr. Perez.[12]  ECF Dkt. #29-1 at 10.  Plaintiff told Dr. Lin that he had fallen twice since his cane was taken and that he was experiencing severe stress and depression over the worry of pain in his sciatic nerve and his leg because it felt the same as when there had been a rupture at C3-C4, causing the cutting of the spinal

---

[10]Kevin Jones is no longer the Warden of AOCI.  AOCI, http://www.drc.ohio.gov/aoci (last visited January 4, 2017).

[11]Ultram is a narcotic-like pain reliever used to treat moderate to severe pain.  Ultram, https://www.drugs.com/ultram.html (last visited January 4, 2017).

[12]Plaintiff mistakenly refers to Dr. Lin as "Dr. Lynn" at ¶133.  ECF Dkt. #29-1 at 10.

cord. *Id.* Dr. Lin renewed Plaintiff's medication for three months and asked Plaintiff when his cane was taken. *Id.* Plaintiff indicated that his cane was taken on September 16, 2014, and Dr. Lin stated that there was nothing he could do about the cane at that time. *Id.*

That same day, Plaintiff reviewed his medical file and could not locate any cane order issued by Defendant Perez or Dr. Granson. ECF Dkt. #29-1 at 10. The only cane order in the file was issued by the podiatrist at Lorain Correctional Institution. *Id.* at 11. Plaintiff also reviewed the file for entries concerning the events of September 16, 2014, the date his cane was taken by Defendant Haggard. *Id.* In his medical file Plaintiff discovered an entry dated September 18, 2014, stating that Defendant Perez and Defendant Haggard observed Plaintiff walking normally and twirling his cane, and concluding that Plaintiff no longer required a cane. *Id.*

On October 23, 2014, Plaintiff received the disposition from the inspector's office indicating that his grievance filed October 5, 2014, had been denied because no rule or law had been violated. ECF Dkt. #29-1 at 11. The following day, Plaintiff filed a supplement to his October 5, 2014, grievance. *Id.* On October 27, 2014, Plaintiff appealed the decision regarding the October 5, 2014, grievance to the chief inspector. *Id.* Plaintiff also submitted an informal complaint to Defendant Edwards regarding Defendant Pederson falsifying medical records by indicating in his medical records that he had not shown up for an appointment. *Id.* Additionally, Plaintiff informed the medical staff that he had fallen three times since his cane was taken, and that he was experiencing a loss of strength, problems in his neck and legs, and numbness in his right leg from the knee to the waist, as well as in his shoulders, arms, and hands. *Id.* On November 7, 2014, Defendant Edwards responded to Plaintiff's informal complaint, indicating that she saw no reason for the complaint as Plaintiff had seen Defendant Pederson and Dr. Lin on October 17, 2014, and had his medications renewed.[13] *Id.*

On November 15, 2014, Plaintiff received a pass to meet with a nurse practitioner. ECF Dkt. #29-1 at 12. Plaintiff explained his symptoms to the nurse, who then stated that she was going to

---

[13]Plaintiff mistakenly refers to Dr. Lin as "Dr. Lynn" at ¶147.

prescribe Baclofen and at some point Plaintiff would "need to get used to the pain."[14]  *Id.*  On November 20, 2014, Plaintiff was informed that his supplemental to the October 5, 2014, grievance was denied for lack of evidence.  *Id.*  Plaintiff's appeal to the decision regarding his October 5, 2014, grievance was denied on November 17, 2014.  *Id.*  Plaintiff resubmitted the appeal with additional information on November 22, 2014. *Id.*  On November 29, 2014, Plaintiff exhausted his supply of Baclofen, and informed a nurse that the medication was less effective than his previous medications.  *Id.*  Plaintiff received a pass to see a nurse on December 18, 2014, and the nurse increased his medication from three doses at fifty milligrams to three doses at one-hundred milligrams.  ECF Dkt. #29-1 at 13.  On December 24, 2014, Plaintiff reported that he had fallen and requested a crutch and a bandage to wrap his knee.  *Id.*  A nurse told Plaintiff that "she was only treating him for the fall."  *Id.*

On January 22, 2015, Plaintiff was transported from AOCI to the PCJC.  ECF Dkt. #29-1 at 14.  Plaintiff was processed by a nurse and told that he would not receive Ultram, but was instead ordered to take eight-hundred milligrams of Motrin three times a day for thirty days.  *Id.*  Plaintiff was told that he would need to put in a request for the Motrin every three days, however, the order for Motrin was cancelled by the doctor after Plaintiff's second request.  *Id.*  A grievance was sent by Plaintiff to Defendant Doak, who went to the jail and spoke with Plaintiff about the grievance.  *Id.*  Defendant Doak told Plaintiff that he would speak with the doctor.  *Id.*  Approximately an hour later, the doctor made Plaintiff sign a statement relating to his kidney damage before he would be given Motrin.  *Id.*

Approximately five days later, Plaintiff met with a nurse and explained that he was having trouble urinating.  ECF Dkt. #29-1 at 14.  The nurse explained to Plaintiff that if she told the doctor that he was having trouble urinating, the doctor would retract Plaintiff's medication because of the statement Plaintiff signed relating to his kidney damage.  *Id.*  Plaintiff told the nurse "it was not his kidney but the pain in his lower back," and that he had the same issue in 2001 and had emergency

---

[14]Baclofen is a muscle relaxer and antispastic agent used to treat muscle symptoms caused by multiple sclerosis, including spasm, pain, and stiffness.  Baclofen, https://www.drugs.com/baclofen.html (last visited January 4, 2017).

surgery to correct the problem.  *Id.*  The nurse stated that "she had been a nurse for twenty-four years and [had] never heard of such a thing."  *Id.*  Plaintiff remained at the jail until April 22, 2015, without seeing the doctor after signing the statement relating to his kidneys.  *Id.*

Upon Plaintiff's return to AOCI on April 22, 2015, Defendant Manley, a nurse at AOCI, renewed his medication orders for two weeks until he could be seen by a doctor.[15]  ECF Dkt. #29-1 at 14.  Plaintiff's evening dose of the pills was not available when he reported for pill call that night. *Id.*  On April 23, 2015, Plaintiff again spoke with Defendant Manley, who told him no appointment had been made for that date.  *Id.*  The following day, Plaintiff visited Defendant Perez.  *Id.*  Plaintiff told Defendant Perez that he needed his pain management medications renewed.  *Id.* at 15. Defendant Perez informed Plaintiff that he was ordering Tylenol and ibuprofen.  *Id.*  Plaintiff also told Defendant Perez about his urination problems, and was told that his "kidney numbers were fine."  *Id.*  On April 25, 2015, Plaintiff filed an informal complaint relating to Defendant Perez's treatment choices.  *Id.*  The informal complaint was denied.  *Id.*

In late May 2015, Plaintiff again reviewed his medical file.[16]  ECF Dkt. #29-1 at 15.  Plaintiff noticed that the no cane order dated September 16, 2014, had been replaced with an order indicating that he had an appointment on September 17, 2014, despite Plaintiff not having an appointment on September 17, 2014.  *Id.*  Additionally, Plaintiff noted three reports that omitted portions of Plaintiff's stated condition.  *Id.*  Plaintiff also took issue with a fourth report, prepared by Defendant Pederson, stating that Plaintiff was complaining about the medications attacking his liver, opining to leave his medication regime as it was, and omitting any mention of Plaintiff's reported urination problems.  *Id.*  After reading this report, Plaintiff spoke with Defendant Perez regarding his liver and the medications he was prescribed, and at some point Defendant Perez asked Defendant Haggard to summon a corrections officer.  *Id.*  Plaintiff was upset that a corrections officer would be learning about his medical issues.  *Id.*  Defendant Perez explained that the corrections officer was there for

---

[15]Plaintiff refers to Defendant Manley as "Defendant Marley" in the second amended complaint. ECF Dkt. #29-1 at 14.

[16]The exact date of this review of Plaintiff's medical record is unknown as Plaintiff provides inconsistent dates in his second amended complaint.  *See* ECF Dkt. #29-1 at 15.

his safety, to which Plaintiff responded that he would not cause any issues and that he had saved a nurse. *Id.* Defendant Perez asked the nurse about Plaintiff's remarks, and the nurse "stated that Plaintiff was the one that saved her." *Id.* Following the nurse's affirmation, Defendant Perez indicated that he would prescribe Ultram. *Id.* Defendant Perez issued a cane order on June 18, 2015, and Plaintiff was given a cane. *Id.* On July 15, 2015, Defendant Perez told Plaintiff that there was nothing that could be done for his neck and that he would always be in pain, and doubled Plaintiff's Ultram prescription. *Id.*

## II.  PROCEDURAL HISTORY

Plaintiff filed his initial complaint on September 14, 2015. ECF Dkt. #1. On September 23, 2015, Plaintiff filed a motion for leave to file an amended complaint, which was granted, and an amended complaint was filed on September 25, 2015. ECF Dkt. #4, #5, #6. Defendant Doak filed a motion to dismiss for failure to state a claim on March 30, 2016. ECF Dkt. #19. On April 25, 2016, Plaintiff filed a motion to amend his complaint a second time. ECF Dkt. #29. Also on April 25, 2016, the AOCI Defendants filed a motion to dismiss for failure to state a claim. ECF Dkt. #30. Defendant Doak filed a brief in opposition to Plaintiff's motion to amend his complaint a second time. ECF Dkt. #32. On May 12, 2016, Defendant Vargo filed a motion to dismiss for failure to state a claim. ECF Dkt. #34.

Plaintiff filed a brief in opposition to the AOCI Defendants' motion to dismiss on May 31, 2016. ECF Dkt. #39. Additionally, on June 2, 2016, Plaintiff filed a supplement to his motion to amend his complaint a second time. ECF Dkt. #40. Defendant Doak filed a response to Plaintiff's supplement to his motion to amend his complaint for a second time on June 3, 2016. ECF Dkt. #41. Plaintiff filed a brief in opposition to Defendant Vargo's motion to dismiss on June 17, 2016. ECF Dkt. #43. On June 22, 2016, Plaintiff filed a motion to put all proceedings on hold. ECF Dkt. #44. Defendant Vargo filed a reply brief in support of his motion for summary judgment on July 1, 2016. ECF Dkt. #46. On July 6, 2016, Defendant Doak filed a response to Plaintiff's motion to put all proceedings on hold. ECF Dkt. #47. Plaintiff filed a reply brief in support of his motion to put all proceedings on hold on July 14, 2016. ECF Dkt. #48.

Per the Order filed contemporaneously to the instant Report & Recommendation, all non-dispositive motion have been resolved. Before the Court remains: (1) Defendant Doak's motion to dismiss; (2) the AOCI Defendants' motion to dismiss; and (3) Defendant Vargo's motion to dismiss. Each motion is addressed in turn below.

### III.    STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action..." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). The plaintiff need not set forth "detailed factual allegations," but the pleading standard set forth by the Supreme Court of the United States

-13-

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

## IV.   ANALYSIS

### A.   Defendant Doak's Motion to Dismiss (ECF Dkt. #19)

Defendant Doak filed his motion to dismiss on March 30, 2016.  ECF Dkt. #19.  Plaintiff did not file a timely brief in response.  On June 2, 2016, Plaintiff filed the "Supplement to to [sic] Amend Complaint Pursuant to Federal Rule 15(A) Via Clarity of Torts" (the "Supplement").  ECF Dkt. #40.  Although the Supplement was filed in connection with Plaintiff's motion to amend the complaint for a second time, Plaintiff also used the Supplement to ask the Court to deny Defendant Doak's motion to dismiss.  *Id.*  Plaintiff's intention to argue against Defendant Doak's motion to dismiss in the Supplement is clear, as Plaintiff opens the Supplement by stating, "[Plaintiff] respectfully asks this Court to decide to DENY Defendant Dave Doaks [sic] Motion to Dismiss..." *Id.* at 1.  Any arguments in the Supplement relating to Defendant Doak's motion to dismiss are untimely as the motion to dismiss was filed over two months prior to the Supplement.  *See* Local Rule 7.1(d).  Insofar as the Supplement pertains to Plaintiff's motion to amend his complaint a second time, it is rendered moot as the Order filed contemporaneously with the instant Report & Recommendation has established Plaintiff's second amended complaint (ECF Dkt. #29-1) as the operative pleading.

In his second amended complaint, Plaintiff asserts the following claims against Defendant Doak:

> Defendant Dave Doak has a duty, under federal and state law to protect the Plaintiff from assault by other even if those others are his friends and employees.  This is a breach of duty by Defendant Doak which resulted in (1) Serious physical and emotional injury and damages.  Defendant Dave Doak participated directly in the alleged constitutional violations (2) Defendant Doak, after being informed of violations through reports failed to remedy those wrongs.  (3) Defendant Doak created a policy or costume in which unconstitutional practices occurred or allowed the continuance of such policy of custom. (4) Defendant Doak was grossly negligent in supervising subordinates who committed wrongful acts. (5) Defendant Doak exhibited deliberate indifference to the right of inmates by failing to act on information indicating that unconstitutional acts were occurring. [sic]

ECF Dkt. #29-1 at 17.  In his motion to dismiss, Defendant Doak asserts that: (1) he is entitled to qualified immunity on any individual-capacity claim; (2) Plaintiff has failed to state a *Monell* claim; and (3) any state-law claim is barred by statutory immunity.

### 1.  Failure to State a Claim and Qualified Immunity

In *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), the Supreme Court set forth a two-step framework for determining whether certain conditions of confinement constitute "cruel and unusual punishment" prohibited by the Eighth Amendment.  "First, [the plaintiff] must plead facts which, if true, establish the existence of a 'sufficiently serious' medical need." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) (internal citation omitted).  "Second, [the plaintiff] must establish the subjective element: he must demonstrate [that the defendant(s)] acted with 'a sufficiently culpable state of mind in denying medical care.'" *Id.*  Only "deliberate indifference" to serious medical needs implicates the protections of the Eighth Amendment.  *Id.*  "Deliberate indifference is characterized by obduracy or wantonness - it cannot be predicate on negligence, inadvertence, or good faith error. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  Liability does not attach unless the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Knowledge of the asserted serious needs or circumstances clearly indicating the existence of such needs is essential to a finding of deliberate indifference.  *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896 (6th Cir. 2004).

Defendant Doak asserts that the claims set forth by Plaintiff are absent of any allegation of unconstitutional conduct, and thus Defendant Doak is entitled to qualified immunity on any purported federal claim.[17]  ECF Dkt. #19-1 at 3.  The Supreme Court of the United States has held

---

[17]Defendant Doak presented his arguments in his motion to dismiss, filed approximately one month prior to Plaintiff's motion to amend his complaint for a second time.  *See* ECF Dkt. #19, #29.  A brief in opposition to Plaintiff's motion to amend his complaint for a second time was timely filed by Defendant Doak. ECF Dkt. #32.  In the Order filed contemporaneously with the instant Report & Recommendation, the undersigned granted Plaintiff's motion to amend his complaint for a second time.  Defendant Doak is not prejudiced by allowing Plaintiff to amend his complaint for a second time, as the arguments presented by Defendant Doak in his motion to dismiss the amended complaint also provide valid reasons to dismiss the second amended complaint as it pertains to Defendant Doak for the reasons provided herein.

that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court of the United States established a two-step procedure for resolving qualified immunity claims. First, a court must decide whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* at 201. Second, the court must decide whether the right at issue was clearly established at the time of the alleged misconduct. *Id.* In *Pearson v. Callahan,* 555 U.S. 223 (2009)*,* the Supreme Court of the United States held that courts are free to address the *Saucier* procedure as they see fit rather than rigidly following the sequence prescribed in *Saucier*.

> As for the actual conduct of Defendant Doak, Plaintiff makes the following assertion:
>
> Plaintiff then wrote a grievance and sent it to [Defendant Doak] the Sheriff a Portage County. The next day [Defendant Doak] came in and spoke with the Plaintiff with his grievance. [Defendant Doak] stated he did not know what he could do for the Plaintiff. Plaintiff stated the grievance system stated he had to follow the chain of command, he then said only that the doctor had to answer to is the Plaintiff; [Defendant Doak] said he would go talk to the doctor.
>
> About an hour later the doctor made Plaintiff sign a statement before he would give Plaintiff his Motrin. [sic]

ECF Dkt. #29-1 at 14. Plaintiff does not provide any additional facts to support his claim against Defendant Doak. Rather than showing actions that were characterized by obduracy or wantonness, Defendant Doak's conduct was responsive to Plaintiff's circumstances. Defendant Doak responded to Plaintiff's grievance the day after it was sent by Plaintiff, personally spoke with Plaintiff, and then spoke with the doctor about Plaintiff's concerns. *See* ECF Dkt. #29-1 at 14. Plaintiff was concerned about not being prescribed Motrin, as a replacement for Ultram, at the PCJC. *Id.* Defendant Doak spoke with the doctor who refused to prescribe Motrin to Plaintiff, and an hour later the doctor provided Motrin to Plaintiff after he agreed to sign a statement relating to his kidney damage. *Id.* Plaintiff fails to demonstrate that Defendant Doak possessed a sufficiently culpable state of mind in denying medical care to rise to the level of deliberate indifference. Instead, based on Plaintiff's own recitation of the facts, Defendant Doak responded to his grievance and took affirmative steps to resolve the issues raised by Plaintiff in the grievance.

Plaintiff provides no additional facts to support his claims that Defendant Doak violated the ADA or infringed upon Plaintiff's constitutional rights.  Further, the facts, as provided by Plaintiff, in no way demonstrate that Defendant Doak's actions violated Plaintiff's constitutional rights.  In the absence of any allegation supporting unconstitutional conduct on behalf of Defendant Doak, Plaintiff has failed to state a under claim 42 U.S.C. § 1983, and, alternatively, Defendant Doak is entitled to qualified immunity.  Accordingly, the undersigned recommends that the second amended complaint be dismissed as to Defendant Doak in his individual capacity.

### 2. *Monell* **Claim**

Defendant Doak also asserts that Plaintiff has failed to state a *Monell* claim.  *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Plaintiff has sued Defendant in his individual and official capacities.  A suit against an individual in his official capacity has been held to be essentially a suit against the local government unit, and as long as the government entity receives notice and an opportunity to respond, an official capacity suit, in all respects other than name, is to be treated as a suit against the governmental entity.  *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989).  "Before a local government can be held liable for injuries under section 1983, whether the suit is pleaded as an official capacity suit or a suit against local government, a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity." *Id.* (citing *Monell*, 436 U.S. at 690).  The policy of custom of the local government must be the moving force of the constitutional violation in order to establish liability under 42 U.S.C. § 1983. *Polk County v. Dodson*, 454 U.S. 312 (1981) (citing *Monell*, 436 U.S. at 694).

Despite asserting that Defendant Doak "created a policy or [custom] in which unconstitutional practices occurred or allowed the continuance of such policy [or] custom," Plaintiff does not present any policy or custom that he claims violated his constitutional rights.  ECF Dkt. #29-1 at 17.  As there was no underlying constitutional violation, Plaintiff's attempt to assert a *Monell* claim fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that neither *Monell* nor any other case authorized the award of damages when there had not been an infliction of constitutional harm).

### **3.**      **State-Law Claims**

Defendant Doak next asserts that any state-law claim is barred by statutory immunity.[18]  ECF Dkt. #19-1 at 4.  Under Ohio law, an official-capacity claim against an official of a political subdivision is the equivalent of suing the political subdivision.[19]  *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1482, ¶21.  Ohio Revised Code ("O.R.C.") § 2744.02(A)(1) states that a political subdivision is not liable for damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function, with five enumerated exceptions.  The exceptions, provided in O.R.C. § 2744.02(B), are limited to injury, death, or loss to person or property caused by: (1) negligent operation of a motor vehicle; (2) negligent performance of acts with respect to proprietary functions; (3) negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads; or (4) negligence of employees within or on the grounds of certain governmental buildings and due to physical defects within or on those grounds (excluding detention facilities).  Additional exceptions may also be imposed by a section of the O.R.C.  *Id.*  None of these exceptions apply, and thus Defendant is correct in asserting that Portage County is entitled to immunity on any state-law claims raised by Plaintiff.

Ohio law also provides immunity to employees of political subdivisions.  O.R.C. § 2744.03 provides, in pertinent part:

> (6)    In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstance not covered by that division or sections 3314.07 and 3746.24 of the [O.R.C.], the employee is immune from liability unless one of the following applies:
>
> > (a)    The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

---

[18]In ¶3 of the second amended complaint, Plaintiff states that the Court has supplemental jurisdiction over his state-law tort claims under 28 U.S.C. § 1367.  Plaintiff does not specify what tort claims he intended to bring under state law.

[19]A county is a political subdivision.  Ohio Revised Code § 2744.01(F).

(b)     The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c)     Civil liability is expressly imposed upon the employee by a section of the [O.R.C.].  Civil liability shall not be construed to exist under another section of the [O.R.C] merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because that section uses "shall" in a provision pertaining to an employee.

The first exception is not satisfied because Defendant Doak was acting within his employment and/or official responsibilities.  Continuing, the second exception does not apply because there are no allegations in the second amended complaint suggesting Defendant Doak's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.  As stated above, Defendant Doak addressed Plaintiff's grievance the day after it was filed, personally spoke with Plaintiff, spoke with the doctor about Plaintiff's concerns, and apparently convinced the doctor to prescribe Motrin once Plaintiff had signed the statement relating to his kidney damage.  *See* ECF Dkt. #29-1 at 14.  Finally, there has been no showing that the second amended complaint implicates any other provision of the O.R.C., and thus the third exception has not been satisfied.   For these reasons, the presumption of immunity provided by O.R.C. § 2744.03 shields Defendant Doak from liability.  Accordingly, Defendant Doak is entitled to immunity under Ohio law in both his official and individual capacities.

### 4.     Recommendation as to Defendant Doak's Motion to Dismiss (ECF Dkt. #19)

The undersigned recommends that the Court find that: (1) Plaintiff has failed to state a claim or, alternatively, Defendant Doak is entitled to qualified immunity on any individual-capacity claim; (2) Plaintiff had failed to state a *Monell* claim; and (3) any state-law claim made by Plaintiff is barred by statutory immunity.  Accordingly, the undersigned recommends that the Court grant Defendant Doak's motion to dismiss (ECF Dkt. #19).

### B.     The AOCI Defendants' Motion to Dismiss (ECF Dkt. # 30)

The AOCI Defendants filed a motion to dismiss on April 25, 2016.  ECF Dkt. #30.  On May 31, 2016, Plaintiff filed a brief in opposition to the AOCI Defendants' motion to dismiss.  ECF Dkt.

-19-

#39.  The AOCI Defendants did not file a brief in reply.  The AOCI Defendants argue that: (1) Plaintiff's action against the AOCI Defendants in their official capacities is barred by the Eleventh Amendment and Plaintiff fails to state a claim; (2) the AOCI Defendants are entitled to qualified immunity; (3) the state-law claims against the AOCI Defendants are not actionable in this Court; (4) Plaintiff fails to state a claim for relief under the ADA; and (5) Plaintiff fails to state a claim under § 504 of the Rehabilitation Act.  ECF Dkt. #30 at 3-17.  For the following reasons, the undersigned recommends that the Court grant the AOCI Defendants' motion to dismiss (ECF Dkt. #30).

### 1. Eleventh Amendment, Failure to State a Claim, and Qualified Immunity

### i. Official-Capacity Claims

The AOCI Defendants first assert that Plaintiff's action against them in their official capacities is barred by the State's Eleventh Amendment immunity and fails to state a claim under 42 U.S.C. § 1983.  ECF Dkt. #30 at 3.  The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  The Supreme Court of the United States has held that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as citizens of another state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Alabama v. Pugh*, 438 U.S.781, 781-82 (1978).  The Sixth Circuit has specifically  held that the Eleventh Amendment prohibits suit against a "state" in federal court whether for injunctive, declaratory, or monetary relief. *Lawson v. Shelby Cty., TN*, 211 F.3d 331, 335 (6th Cir. 2000).  "[A] suit against a state official in his or her official capacity is not a suit against that official but rather is a suit against the official's office." *Will v. Mich.Dep't of State Police*, 491 U.S. 58, 71 (1989).  The Court of Claims Act, O.R.C. Chapter 2743, created a limited waiver of the State's sovereign immunity, grating consent to be sued in the Court of Claims.  O.R.C. § 2743.03(A)(1) provides that the Court of Claims has exclusive, original jurisdiction over all civil actions against the State permitted by the waiver of immunity.

-20-

All of the AOCI Defendants were employees of a state agency, the Ohio Department of Corrections and Rehabilitation, at the time of the alleged conduct upon which Plaintiff asserts his claims. *See* AOCI, http://www.drc.ohio.gov/aoci (last visited January 4, 2017). None of the AOCI Defendants have consented to being sued in this Court. Accordingly, this action against Defendants in their official capacities is barred by the Eleventh Amendment. Plaintiff contends that the action is not barred by the Eleventh Amendment, stating that he is not suing the State, but is suing twelve different people in their individual capacities, nine of which constitute the AOCI Defendants. ECF Dkt. #39 at 3. However, Plaintiff fails to acknowledge that when he brought suit against the AOCI Defendants in their official capacities he did bring suit against the State insofar as each of the AOCI Defendants was a State employee. For the above stated reasons, the undersigned finds that this action against the AOCI Defendants in their official capacities is barred by the Eleventh Amendment.

### ii.    Individual-Capacity Claims: Failure to State a Claim and Qualified Immunity

Defendant asserts that Plaintiff has failed to state a claim against each of the AOCI Defendants and that they are all entitled to qualified immunity. ECF Dkt. #30 at 6-13. The undersigned agrees. Plaintiff's second amended complaint fails to present sufficient factual matter to state a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678. The second amended complaint fails to plead factual content that allows the court to draw the reasonable inference that any of the AOCI Defendants violated Plaintiff's civil rights. *See id.* Further, after stating the facts, Plaintiff merely provides a lengthy list of legal conclusions, largely devoid of any analysis of how the facts support the legal conclusions. Accordingly, Plaintiff has failed to state a claim against any of the AOCI Defendants.

Defendant also asserts that each of the AOCI Defendants are entitled to qualified immunity. ECF Dkt. #30 at 13-14. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 828 (1982). As detailed above, the Court must decide whether the facts that the plaintiff

has alleged or shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the alleged misconduct.  *See Saucier*, 533 U.S. at 194; *Pearson*, 555 U.S. at 223.

A defense of qualified immunity may not be rebutted by evidence that a defendant's conduct was malicious or otherwise improperly motivated.  *Crawford-El v. Britton*, 523 U.S. 574, 588 (1988).  Evidence concerning the defendant's subjective intent is simply irrelevant to the defense of qualified immunity.  *Id.*  "[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery."  *Harlow*, 457 U.S. at 817-18.  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 818.  Further, federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or law.  *Butz v. Economou*, 438 U.S. 478 (1978).  Even if the Court determines that Plaintiff has stated a claim against any of the AOCI Defendants, each defendant would be entitled to qualified immunity because none of the AOCI Defendants' actions violated clearly established constitutional rights.  The undersigned will now address each of the AOCI Defendants in turn.

### a.  Defendant Edwards

The facts, as presented in Plaintiff's second amended complaint, indicate that Defendant Edwards threatened to move Plaintiff to a different facility following a disagreement regarding the Plaintiff visiting Dr. Lin.  ECF Dkt. #29-1 at 7.  Additionally, Plaintiff indicated that, according to Defendant Lynn, Defendant Edwards ordered him to take Plaintiff's cane; however, Plaintiff also stated that Defendant Edwards indicated that this was a lie.  *Id.* at 8.  Plaintiff fails to explain how either of these actions is a violation of a clearly established constitutional right.  No explanation is provided as to how the statement by Defendant Edwards that she may transfer Plaintiff to a different facility violated a constitutional right, especially considering no action was ultimately taken by Defendant Edwards.  In fact, Plaintiff never states what constitutional right he believes was infringed upon by Defendant Edwards' statement.

Plaintiff appears to claims that Defendant Edwards ordered Defendant Lynn to take Plaintiff's cane, despite her denying issuing such an order. ECF Dkt. #7-8. However, Plaintiff also claims that he "knew" it was Defendant Pederson who told Defendant Lynn that Plaintiff did not have a cane order, and maintains this position in the second amended complaint. *Id.* at 8, 18. The only mention of Defendant Edwards issuing the order to take Plaintiff's cane was by Defendant Lynn, who referenced Plaintiff's disagreement with Defendant Edwards of over a visit with Dr. Lin when taking the cane, and Defendant Lynn's disclosure in a subsequent meeting that Defendant Edwards gave the order to take Plaintiff's cane. *Id.* Plaintiff was made aware of Defendant Lynn's statements by his case manager, and he was also made aware that Defendant Edwards stated that Defendant Lynn was lying. *Id.* The facts do not establish that Defendant Edwards issued any order to take Plaintiff's cane, let alone an order that was issued as the result of her disagreement with Plaintiff.

Plaintiff has alleged that Defendant Edwards' actions amounted to: retaliation; unwarranted affliction of pain; cruel and unusual punishment; tampering with medical records; removal or destruction of medical records; violations of federal and state tort law for negligence; and severe stress and severe emotional distress.[20] ECF Dkt. #29-1 at 18. Plaintiff provides no explanation as to how Defendant Edwards' threat that she would move him to a different facility, which was never acted upon, gives rise to these claims. Further, the facts do not establish that Defendant Edwards "had [corrections officers] interfere with medical orders," as alleged by Plaintiff. *See id.* Despite Plaintiff's claims that Defendant Edwards began a strategy of retaliation against him, involving three corrections officers, four medical staff members, and an ADA representative, Plaintiff presents no facts to support the existence of a conspiracy to retaliate against him initiated by Defendant Edwards, or perpetuated by any of the AOCI Defendants. Plaintiff has failed to show that Defendant

---

[20]The undersigned recognizes that qualified immunity is not necessarily a defense to all of the claims asserted by Plaintiff for each Defendant; however, since Plaintiff does not specify how each claim amounts to a constitutional violation, all claims against all defendants will be set forth in the following discussion as this method is most deferential to Plaintiff.

Edwards violated a constitutional right and has thus failed to state a claim under 42 U.S.C. § 1983 against Defendant Edwards.

### b.      Defendant Shaw

Plaintiff claims that Defendant Shaw retaliated against him and "helped cause the affliction of pain" by stating that she was going to have Plaintiff's cane taken from him and stating that Plaintiff had a no standing pass, bunk restrictions, and the names of medications used by Plaintiff. ECF Dkt. #29-1 at 18.  No attempt is made by Plaintiff to explain how these action amount to a constitutional violation.  Plaintiff's bare allegations of malice are insufficient to state a claim under 42 U.S.C. § 1983 against Defendant Shaw.  *See Harlow* 457 U.S. 817-18.

### c.      Defendants Lynn and Couch

According to the second amended complaint, Defendant Lynn and Defendant Couch, both corrections officers at AOCI, confiscated Plaintiff's cane after they were informed by a nurse that Plaintiff did not have a cane order.  ECF Dkt. #29-1 at 7-8.  Plaintiff now claims that Defendant Lynn and Defendant Couch: deprived him of his rights by not finding a commanding officer when requested by Plaintiff; interfered with verifiable medical orders when they took Plaintiff's cane; caused direct pain; inflicted cruel and unusual punishment; caused severe emotional distress and depression; and violated federal and state tort laws for their negligence.  ECF Dkt. #29-1 at 18. Again, Plaintiff provides no explanation as to how he believes the actions of these defendants violated his constitutional rights.

The facts show that Defendant Lynn and Defendant Couch took Plaintiff's cane after being told by a nurse that Plaintiff did not have a cane order.  Plaintiff cites no law or rule indicating that these two corrections officers were required to present a commanding officer at Plaintiff's request. Defendant Lynn and Defendant Couch were performing discretionary functions of the type that are generally shielded from liability for civil damages insofar as the conduct did not violate clearly established constitutional rights of which a reasonable person would have known.  *See Harlow*, 457 U.S. at 818.  Plaintiff has failed to show that Defendant Lynn or Defendant Couch violated his constitutional rights, and has thus failed to state a claim under 42 U.S.C. § 1983 against either defendant.

### d.      **Defendant Haggard**

Per the second amended complaint, Defendant Haggard, a nurse at AOCI, told Plaintiff that he was required to leave his cane with her when Plaintiff exited Defendant Perez's office after a visit on September 16, 2014.  ECF Dkt. #29-1 at 9.  Defendant Haggard also reported witnessing Plaintiff walking fine and twirling his cane, and Plaintiff suggests that she falsified a medical report to this extent.  *Id.* at 11.  Further, Plaintiff asserts that Defendant Haggard left the door to Defendant Perez's office open so others could hear about Plaintiff's confidential medical issues.  *Id.* at 14-15.  As a result of these actions, Plaintiff asserts that Defendant Haggard: caused cruel and unusual punishment; engaged in retaliation; caused the unwarranted affliction of pain; interfered with Plaintiff's medical treatment; falsified medical records; violated federal and state tort law for negligence; and allowed others to hear Plaintiff's confidential medical information.  *Id.* at 19.

Again, Plaintiff makes no attempt to explain how Defendant Haggard's actions violated his constitutional rights beyond stating those actions and later listing the alleged violations.  Specifically, Plaintiff does not demonstrate that Defendant Haggard told Plaintiff to leave his cane with her amounts to a constitutional violation as she appears to have taken the cane after speaking with Defendant Perez, who also claimed to see Plaintiff walking normally and twirling his cane.  Further, Plaintiff fails to explain how Defendant Haggard's action were in retaliation for any action taken by Plaintiff.  Plaintiff also claims that Defendant Haggard falsified medical evidence.  It appears that this allegation is grounded in the fact that a report dated September 18, 2014, states that Defendant Perez and Defendant Haggard witnessed Plaintiff "walking fast and fine while twirling his cane," despite Plaintiff's cane having been taken on September 16, 2014.  *See* ECF Dkt. #29-1 at 11.  Plaintiff does not show how the fact that the date on the report was two days after his cane was taken demonstrates that the report was falsified, rather than simply filed on a different day than the activity detailed in the report.  Moreover, Plaintiff does not claim that Defendant Haggard filed the report.  Finally, the facts do not support Plaintiff's contention that Defendant Haggard left the door to Defendant Perez's office open in an attempt to allow others to hear confidential medical information.  Rather, the facts show that Defendant Perez ordered Plaintiff to leave the office door open.  Defendant Haggard's only role was telling Plaintiff it was his turn for a a screening.  As none

of these events constitute a violation of Plaintiff's constitutional rights, Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against Defendant Haggard.

### e.      Defendant Pederson

In the second amended complaint, Plaintiff indicates that Defendant Pederson, a nurse at AOCI: told Defendant Lynn and Defendant Couch to take his cane; falsely reported that Plaintiff did not attend an appointment; and did not include Plaintiff's reported urination issues in a report she prepared. ECF Dkt. #29-1 at 8, 10, 15. Based on these actions, Plaintiff claims that Defendant Pederson: caused cruel and unusual punishment; falsified medical records; interfered with medical treatment on numerous occasions; caused an unwarranted amount of physical and emotional pain; and caused severe emotional distress and depression through her negligence. *Id.* at 19-20. Plaintiff does not explain how the alleged facts give rise to his claims, except insofar as his allegation of cruel and unusual punishment arises from Defendant Pederson's order to Defendant Lynn and Defendant Couch to take Plaintiff's cane. *Id.* at 19.

None of Plaintiff's claims against Defendant Pederson amount to constitutional violations. First, the facts do not establish that Defendant Pederson was the individual who ordered Defendant Lynn and Defendant Couch to take Plaintiff's cane; rather, the facts demonstrate only that Plaintiff believed it was Defendant Pederson who gave the order. ECF Dkt. #29-1 at 8. Additionally, Defendant Lynn apparently told Plaintiff that Defendant Edwards had ordered him to take the cane, although it was reported to Plaintiff that Defendant Edwards denied the allegation. *Id.* Accordingly, the facts do not establish that Defendant Pederson was the individual who ordered Defendant Lynn and Defendant Couch to take Plaintiff's cane. Plaintiff also states that Defendant Pederson marked in his medical record that he failed to attend a medical appointment, however, Plaintiff indicates that he did not attend the appointment, stating that he was not issued a pass. *Id.* Defendant Pederson's indication that Plaintiff did not attend the medical appointment was true. Plaintiff's explanation that he was not issued a pass to attend the appointment does not render Defendant Pederson's indication in the medical record noting that Plaintiff did not attend the appointment akin to falsifying medical evidence. Additionally, Plaintiff does not explain how the fact that Defendant Pederson did not mark his medical record to reflect that he had reported urinary problems constitutes falsifying

medical evidence or a constitutional violation.  Plaintiff has failed to show that Defendant Pederson violated his constitutional rights, and has thus failed to state a claim under 42 U.S.C. § 1983 against Defendant Pederson.

### f.      Defendant Featheringham

Per the second amended complaint, Plaintiff sent Defendant Featheringham, the ADA representative at AOCI, an inmate accommodation request form in September 2014 and made two inquiries into the status of the form in November 2014. ECF Dkt. #29-1 at 9, 11-12.  Plaintiff asserts that Defendant Featheringham failed to do her duty as a representative of the American Disabilities Association and caused: the unwarranted affliction of pain; extreme emotional distress and depression; and cruel and unusual punishment.  *Id.* at 19.  Further, Plaintiff claims that Defendant Featheringham violated federal and state tort law for negligence.  *Id.*  Plaintiff does not explain how he believes that Defendant Featheringham's treatment of his inmate accommodation request form violated multiple constitutional rights beyond stating that she "refused to do her duty as a representative of the American Disabilities Association."  *Id.*  None of the actions performed by Defendant Featheringham constitutes a violation of Plaintiff's constitutional rights, Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against Defendant Featheringham.

### g.      Defendant Manley

The second amended complaint indicates that Defendant Manley, a nurse at AOCI, renewed Plaintiff medication orders for two weeks, and that Plaintiff asked Defendant Manley if he had an appointment to see a doctor on April 23, 2015.  ECF Dkt. #29-1 at 14.  According to Plaintiff, Defendant Manley was rude when telling Plaintiff that no appointment had been made by the nurse on the second shift.  *Id.*  Plaintiff asserts that Defendant Manley: interfered with medical help; falsified medical records; had a corrections officer evaluate his medical problem; denied medical treatment; caused cruel and unusual punishment; caused severe emotional distress and depression caused unwanted pain; engaged in retaliation; and violated federal and state tort laws for negligence. *Id.* at 19.

Again, Plaintiff does not explain how he believes Defendant Manley's actions warrant a violation of his constitutional rights. Rather, the facts indicate that Defendant Manley interacted with Plaintiff on two occasions, and on one of these occasions Plaintiff claims that she was rude. *See* ECF Dkt. #29-1 at 14. Plaintiff also appears to suggest that Defendant Manley prevented him from making an appointment with a physician. *See id.* Despite Plaintiff's suggestion, the facts as presented in the second amended complaint indicate that Defendant Manley did not make the appointment because she was not allowed to schedule the appointment. *See id.* Additionally, Plaintiff appears to suggest that Defendant Manley withheld his prescriptions because no medication was available the evening he returned to AOCI from the PCJC. *Id.* However, Plaintiff never explains or asserts how Defendant Manley was responsible for the lack of medication at the pill call on April 22, 2015, or how the lack of pain medication for a single evening constitutes a constitution violation.

Further, Plaintiff makes no indication as to how Defendant Manley was deliberately indifferent towards his medical needs. The Supreme Court of the United States has established that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1076). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eight Amendment." *Id.* at 106. The Supreme Court has recognized two components of Eighth Amendment claims made by prisoners: the objective component ("[w]as the deprivation sufficiently serious?"; and the subjective component ("[d]id the officials act with a sufficiently culpable state of mind?"). *Wilson v. Seiter*, 501 U.S. 291, 298 (1991).

Plaintiff's allegations against Defendant Manley essentially amount to claims based on alleged rudeness and her refusal to schedule an appointment, which appears to be due to institutional rules. These actions do no offend evolving standards of decency in violation of the Eight Amendment, or constitutes the unnecessary and wanton infliction of pain. Rudeness and refusing to schedule a medical appointment based on an institutions rules do not constitute sufficiently

-28-

serious deprivations, and Plaintiff has not shown that Defendant Manley acted with a sufficiently culpable state of mind to warrant a finding that his constitutional rights were violated.  Plaintiff has failed to show that Defendant Manley violated his constitutional rights, and thus Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against Defendant Manley.

### h.      Defendant Perez

Per the second amended complaint, Defendant Perez, chief medical officer at AOCI, treated Plaintiff from his arrival at AOCI through the events described in the second amended complaint. Upon Plaintiff's arrival at AOCI, Defendant Perez "renewed all [of Plaintiff's] orders and restrictions" and issued a new cane order.  ECF Dkt. #29-1 at 7.  Defendant Perez later revoked the cane order after he allegedly saw Plaintiff walking fine and twirling the cane.  *Id.* at 9.  Plaintiff denies these allegations.  *Id.*  Defendant Perez continued to prescribe medications for Plaintiff's complaint during Plaintiff's time at AOCI.  *Id.* at 15-16.  Additionally, Defendant Perez eventually reinstated Plaintiff's cane order.  *Id.* at 16.  Finally, the last paragraph of the second amended complaint indicates that Defendant Perez informed Plaintiff that "nothing could be done for his neck" and that he would always be in pain, and then doubled the amount of Ultram prescribed to Plaintiff.  *Id.*

Plaintiff asserts that Defendant Perez: caused the unwarranted affliction of pain; caused severe emotional distress and depression; caused cruel and unusual punishment; falsified medical records; interfered with medical orders once prescribed; violated doctor patient confidentiality; engaged in retaliation; and violated federal and state tort laws for negligence.  ECF Dkt. #29-1 at 19-20.  Like the majority of the other claims stated against the AOCI Defendants, Plaintiff does not explain how the factual allegations contained in the second amended complaint give rise to the alleged constitutional violations.

After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."  *Id.*

Plaintiff has failed to show that Defendant Perez was deliberately indifferent to his medical needs. It appears that Plaintiff argues that Defendant Perez violated his Eighth Amendment rights by refusing to issue a cane order despite Plaintiff's complaints of pain. However, the facts, as set forth by Plaintiff, show that Defendant Perez treated Plaintiff's medical conditions with pain medications and cane orders during Plaintiff's time at AOCI. The only time that there was no cane order was pending was from September 16, 2014, to June 18, 2015. ECF Dkt. #29-1 at 9, 16. During this period of time, Defendant Perez treated Plaintiff with medication, and Defendant Perez increased Plaintiff's Ultrim dosage on July 15, 2015, after informing Plaintiff that the pain would be permanent. *Id.* at 16. Plaintiff suggests that Defendant Perez's treatment constitutes deliberate indifference, however, Plaintiff has failed to demonstrate that the treatment choices made by Defendant Perez were unnecessary and wanton inflictions of pain constituting cruel and unusual punishment forbidden by the Eighth Amendment. Accordingly, Plaintiff has failed to establish the subjective component of his Eighth Amendment claim, and has failed to show that Defendant Perez violated his constitutional rights.

It is unclear to what extent Plaintiff believes that Defendant Perez falsified medical records as Plaintiff never indicates that Defendant Perez falsified any medical records. Likewise, it is not clear why Plaintiff believes Defendant Perez violated his constitutional rights by interfering with prescribed medical orders as Defendant Perez is a physician who met fairly frequently with Plaintiff during his time at AOCI, and who also issued medical orders. Regarding the alleged violation of doctor-patient confidentiality, it appears that Plaintiff is referring to the occasion upon which Defendant Perez called in a corrections officer to the exam during a disagreement with Plaintiff over his medical treatment. *See* ECF Dkt. #29-1 at 15-16. However, it appears that Defendant Perez also closed the office door after explaining that the corrections officer was there for his protection, and then Plaintiff continued the discussion regarding his medical issues. *Id.* at 16. Plaintiff cites no rule or case law preventing a prison physician from having a corrections officer present for protection, and, in any event, Plaintiff waived any doctor-patient confidentiality by willfully continuing the conversation with the corrections officer present. Continuing, Plaintiff does not explain why Defendant Perez, the chief medical officer at AOCI, would have any sufficient reason to retaliate

against him, especially considering Defendant Perez did eventually reinstate Plaintiff's cane order and increase his pain medications.

As stated above, the facts show that Defendant Perez treated Plaintiff's complaints with medications and cane orders, and that there was a period of approximately eleven months during which the cane order was revoked before it was reinstated. The facts, as presented by Plaintiff, do not show that Defendant Perez violated any of Plaintiff's constitutional rights. And thus Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against Defendant Perez.

## 2. State-Law Claims

It is not clear from the second amended complaint exactly what state-law claims Plaintiff intended to assert against the AOCI Defendants. Regardless, any state-law claims asserted by the Plaintiff against the AOCI Defendants are not actionable in this Court. O.R.C. § 9.86 states:

> No officer or employee shall be liable in any civil action that arises under the law of [the State of Ohio] for damage or injury caused in the performance of duties, unless that officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Under O.R.C. § 2743.02(F), the Ohio Court of Claims has "exclusive, original jurisdiction" to determine whether an officer or employee is entitled to personal immunity under O.R.C. § 9.86. Until the Ohio Court of Claims determined that the AOCI Defendants are not immune, there is no cause of action cognizable under Ohio law over which this Court can assert pendent jurisdiction. *Haynes v. Marshall*, 887 F.2d 700 (6th Cir. 1989); *Prior v. Mukasey*, No. 3:08CV994, 2008 WL 5076821, at *2 (N.D. Ohio Nov. 21, 2008) ("The Sixth Circuit has read §§ 9.86 and 2743.02(F) together to hold that a state employee is immune from state-law claims until the Court of Claims has held that § 9.86 immunity is unavailable"). The AOCI Defendants are state employees, and Plaintiff has not indicated that the Ohio Court of Claims made the requisite finding(s) to confer jurisdiction to this Court. Accordingly, the AOCI Defendants are immune from Plaintiff's state-law claims.

## 3. ADA Claim

Plaintiff also alleges violations of the ADA in the second amended complaint. ECF Dkt. #29-1 at 1, 21. The AOCI Defendants contend that even if Plaintiff were to demonstrate that he suffers from a disability recognized by the ADA, his claim against the AOCI Defendants in their

official capacities should be dismissed because Title II of the ADA does not provide for suit against individual defendants.[21] ECF Dkt. #30 at 16. Title II of the ADA governs nondiscrimination on the basis of disability in state and local government services and prohibits discrimination by public entities on the basis of discrimination. The term "public entity" is defined, in relevant part, as "any State or local government." *See* 42 U.S.C. § 12131(A). The Sixth Circuit has repeatedly held that the ADA does not permit public employees or supervisors to be sued in their individual capacities. *Williams v. McLemore*, 247 Fed.Appx. 1, 6 (6th Cir. 2007). Accordingly, Plaintiff fails to state a claim under the ADA against any of the AOCI Defendants.

The AOCI Defendants do not address Plaintiff's ADA claims against them in their official capacities, presumably relying on the argument put forth regarding Eleventh Amendment sovereign immunity. "[A] suit against a state official in his or her official capacity is not a suit against that official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. As discussed above, typically the Eleventh Amendment would automatically bar the suit as it is filed against the State of Ohio. However, in *United States v. Georgia*, 546 U.S. 151, 159 (2006), the Supreme Court of the United States held:

> [I]nsofar as Title II creates a private cause of action for damages against States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.

(emphasis in original); *see also Fox v. Michigan Dept. Of Corrections*, No. 08-cv-14410, 2010 WL 726517, at *2 (E.D. Mich. Feb. 23, 2010) ("The [Supreme Court of the United States] held that Congress, in authorizing damages suits against states as a remedy for violations of Title II, abrogated states' sovereign immunity only to the extent that the violations at issue also implicate substantive constitutional rights"). Plaintiff may bring suit against the State on his ADA claim only if he can demonstrate conduct that actually violated substantive constitutional rights. The second amended complaint does not demonstrate conduct by any named defendants that actually violated any constitutional provision.

### 4. Rehabilitation Act Claim

---

[21]The Supreme Court of the United States has held that state prisons fall squarely within Title II's statutory definition of "public entity." *Pennsylvania Dept. Of Corrections v. Yeskey*, 524 U.S. 206 (1998).

Plaintiff also alleges a violation of § 504 of the Rehabilitation Act. § 504(a) of the Rehabilitation Act states, in relevant part:

> No otherwise qualified individual in the United States, as defined in section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Plaintiff does not show in the second amended complaint that he is disabled for the purpose of § 504 of the Rehabilitation Act. Moreover, Plaintiff never claims that the alleged denial of adequate medical treatment is based on a disability or a handicap of any kind. Rather, Plaintiff asserts that the alleged denial of medical treatment is the result of retaliation. *See* ECF Dkt. #29-1. Accordingly, Plaintiff has failed to state a claim under § 504 of the Rehabilitation Act.

### 5. Recommendation as to the AOCI Defendants' Motion to Dismiss (ECF Dkt. #30)

For the foregoing reasons, the undersigned recommends that the Court find that: (1) all official-capacity claims against the AOCI Defendants are barred by the Eleventh Amendment; (2) Plaintiff has failed to state a claim against any AOCI Defendant in his or her official capacity, or, alternatively, each AOCI Defendant is entitled to qualified immunity; (3) the AOCI Defendants are immune from Plaintiff's state-law claims; (4) Plaintiff has failed to state a claim under the ADA; and (5) Plaintiff has failed to state a claim under § 504 of the Rehabilitation Act. Accordingly, the undersigned recommends that the Court grant the AOCI Defendants' motion to dismiss (ECF Dkt. #30).

### C. Defendant Vargo's Motion to Dismiss (ECF Dkt. #34)

Defendant Vargo filed a motion to dismiss on May 12, 2016. ECF Dkt. #34. In his motion to dismiss, Defendant Vargo asserts that: (1) Plaintiff has failed to set forth sufficient facts to support a claim; (2) Plaintiff's claim under the ADA fails as a matter of law; and (3) Plaintiff's proposed second amended complaint is futile and should be denied. Defendant Vargo's third assertion is moot as the undersigned has granted Plaintiff's motion for leave to file a second amended complaint. Plaintiff filed a brief in opposition to Defendant Vargo's motion to dismiss on June 17, 2016. ECF

Dkt. #43-1.[22]  Defendant Vargo filed a brief in reply on July 1, 2016.  ECF Dkt. #46.  For the following reasons, the undersigned recommends the Court grant Defendant Vargo's motion to dismiss (ECF Dkt. #34).

### 1.     Failure to State a Claim

Defendant asserts that Plaintiff has failed to state a claim against Defendant Vargo, chief medical officer at the PCJC.  ECF Dkt. #34 at 6.  Continuing, Defendant states that it appears Plaintiff alleges the Defendant Vargo violated his Eighth Amendment rights for failing to provide appropriate medical treatment while Plaintiff was incarcerated at the PCJC.  *Id.* at 7.  The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care, as deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain.  *Estelle*, 429 U.S. at 103-105.  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows and disregards an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  As discussed above, there is both an objective component and a subjective component that must be considered when deliberate indifference is alleged.  *Reilly*, 680 F.3d at 613.

The Supreme Court of the United States has held that "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-106.  Accordingly, the allegation that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim for medical mistreatment under the Eighth Amendment.  *Id.* at 106.  In evaluating a deliberate indifference claim, "[courts] distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (1976); *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical

---

[22]Plaintiff's complete opposition to Defendant Vargo's motion to dismiss is docketed as ECF Dkt. #43-1.

judgments.'" *Id.* (quoting *Westlake*, 537 F.3d at 860 n. 5). "However, it is possible for medical treatment to be so woefully inadequate as to amount to no treatment at all." *Id.* (quoting *Westlake*, 537 F.3d at 860 n. 5).

Defendant asserts that Plaintiff has failed to allege facts supporting a claim for deliberate indifference. ECF Dkt. #34 at 8-11. Continuing, Defendant states that Plaintiff apparently takes issue with Defendant Vargo's decision to substitute Motrin for Ultrim as a pain relief drug, and that Plaintiff merely disagrees with Defendant Vargo's decision to substitute Motrin, despite failing to allege that he suffered any injury as a result of the substitution. *Id.* at 9. Defendant also indicates that the form that Plaintiff was required to sign was in response to Defendant Vargo's concerns over Plaintiff's kidney damage. *Id.* Further, Defendant states that Plaintiff does not allege that Defendant Vargo ignored requests for further treatment, and indicated that he never saw Defendant Vargo again during his incarceration at the PCJC. *Id.*

Defendant's arguments are well taken. The second amended complaint alleges that Defendant Vargo: examined Plaintiff; took x-rays of Plaintiff's neck; ordered that Plaintiff be placed on bed rest until he would be at the PCJC and could examine Plaintiff; informed Plaintiff that nothing in his neck was broken; and prescribed Motrin for Plaintiff's neck pain. ECF Dkt. #29-1 at 3-4. Defendant Vargo also contacted Plaintiff's surgeon at the Cleveland Clinic, at Plaintiff's request, and, after speaking with the surgeon, still believed that the Motrin prescription was the correct treatment option. *Id.* at 4. Plaintiff complains that he was placed in segregation for four days until Defendant Vargo could see him, however, Plaintiff only states that Defendant Vargo ordered bed rest until a visit could occur. *See id.* at 3. Plaintiff fails to demonstrate how his conditions in segregation for the four days while he waited for Defendant Vargo to return to the prison were the direct result of any action taken by Defendant Vargo, or even the intention of Defendant Vargo when he ordered bed rest. Further, Plaintiff complains that Defendant Vargo joked about his neck with employees of the PCJC, but fails to show any manner in which this conduct would lead to a finding that Defendant Vargo was deliberately indifferent when providing medical care. *See id* at 4. Additionally, the form Plaintiff was required to sign to receive Motrin during a subsequent visit to the PCJC appears to have been issued as a result of Defendant Vargo's concerns relating to

Plaintiff's kidney damage, rather than as some attempt to prevent Plaintiff from receiving pain medication. *See id.* at 14.

The facts, as set forth in the second amended complaint, do not demonstrate that Dr. Vargo was deliberately indifferent to serious medical needs.  Defendant Vargo examined Plaintiff, took x-rays of Plaintiff's neck, ordered that Plaintiff be placed on bed rest until a subsequent examination could be performed, reviewed the x-rays and determined nothing in Plaintiff's neck was broken, called a surgeon at Plaintiff's request, prescribed Motrin for Plaintiff's pain, discontinued Motrin during a subsequent visit out of concerns relating to Plaintiff' kidney damage, and re-prescribed Motrin at Plaintiff's request.  Plaintiff's claim is one in which he is asserting that he received inadequate medical treatment, rather than no medical treatment. "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments.'"  *Alspaugh*, 643 F.3d at 169  (quoting *Westlake*, 537 F.3d at 860 n. 5). Plaintiff has not shown that the medical treatment he received from Defendant Vargo was negligent, let alone tantamount to cruel and unusual punishment.  Accordingly, Defendant Vargo did not violate Plaintiff's Eighth Amendment rights and Plaintiff has failed to state a claim under 42 U.S.C. § 1983 against Defendant Vargo.

### 2.  ADA Claim

Defendant Vargo is immune from suit under the ADA for the same reasons as the AOCI Defendants, as he is an individual, rather than a public entity, and there has been no underlying violation of Plaintiff constitutional rights. *See* (IV)(B)(3), *supra*.

### 3.  Recommendation as to Defendant Vargo's Motion to Dismiss (ECF Dkt. #34)

For the foregoing reasons, the undersigned recommends that the Court find that: (1) Plaintiff has failed to state a claim against Defendant Vargo; (2) Plaintiff's ADA claim against Defendant Vargo fails as a matter of law; and (3) Defendant Vargo's assertion that the second amended complaint should be denied as futile is moot.  Accordingly, the undersigned recommends that the Court grant Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests dismissal

of all claims against Defendant Vargo, and deny Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests that Plaintiff's second amended complaint be denied as moot.

**V.      CONCLUSION AND RECOMMENDATION**

For the above stated reasons, the undersigned RECOMMENDS that the Court: GRANT Defendant Doak's motion to dismiss (ECF Dkt. #19); GRANT the AOCI Defendants' motion to dismiss (ECF Dkt. #30); GRANT Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests dismissal of all claims against Defendant Vargo, and DENY Defendant Vargo's motion to dismiss (ECF Dkt. #34) insofar as it requests that Plaintiff's second amended complaint be denied as futile; and dismiss Plaintiff's case with prejudice as to all defendants except Defendant Dr. Carol Miller.


Date: January 10, 2017                           */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).